# 24-1099

*To Be Argued By*:
ROBERT B. SOBELMAN

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 24-1099

◄◆◆◆►

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

AIMEE HARRIS,

*Defendant-Appellant*,

ROBERT KURLANDER,

*Defendant*.

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

EDWARD Y. KIM,
*Acting United States Attorney
for the Southern District
of New York*,
*Attorney for the United States
of America*.
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

JACQUELINE C. KELLY,
ROBERT B. SOBELMAN,
MITZI S. STEINER,
JACOB R. FIDDELMAN,
*Assistant United States Attorneys*,
*Of Counsel*.

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.  The Offense Conduct . . . . . . . . . . . . . . . . . .  2

    B.  Harris's Guilty Plea . . . . . . . . . . . . . . . . . . .  5

    C.  The Presentence Reports . . . . . . . . . . . . . . .  5

    D.  Harris's Sentencing . . . . . . . . . . . . . . . . . . .  7

ARGUMENT:

The District Court Did Not Plainly Err in
    Authorizing the Release of Relevant
    Information to Treatment Providers . . . . . . . .  11

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  12

        1.  Conditions of Supervised Release . . . .  12

        2.  Standard of Review . . . . . . . . . . . . . . .  14

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  15

        1.  Ordinary Plain Error Review
            Applies . . . . . . . . . . . . . . . . . . . . . . . . .  15

        2.  There Was No Error, Plain or Otherwise,
            in the District Court's Standard
            Disclosure Authorizations in Aid of
            Effective Supervision . . . . . . . . . . . . . .  18

ii

PAGE

3. The District Court's Disclosure
Authorization Did Not Improperly
Delegate Sentencing Authority to the
Probation Office . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**TABLE OF AUTHORITIES**

*Cases*:

*Puckett v. United States*,
556 U.S. 129 (2009). . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. A-Abras Inc.*,
185 F.3d 26 (2d Cir. 1999) . . . . . . . . . . . . . . . . . 13

*United States v. Adams*,
749 F. App'x 25 (2d Cir. 2018) . . . . . . . . . . . . . . 16

*United States v. Ahmed*,
802 F. App'x 614 (2d Cir. 2020) . . . . . . . . . . . . . 14

*United States v. Betts*,
886 F.3d 198 (2d Cir. 2018) . . . . . . . . . .  12, 13, 18

*United States v. Bleau*,
930 F.3d 35 (2d Cir. 2019) . . . . . . . . . . . . . . . . . 16

*United States v. Brown*,
402 F.3d 133 (2d Cir. 2005) . . . . . . . . . . . . . . . . 12

*United States v. Carlineo*,
998 F.3d 533 (2d Cir. 2021) . . . . . . . . . . . . . 14, 25

iii

PAGE

*United States v. Chaklader,*
    232 F.3d 343 (2d Cir. 2000) . . . . . . . . . . . . . . . . . 13

*United States v. Charmer Indus., Inc.,*
    711 F.2d 1164 (2d Cir. 1983) . . . . . . . . . . . . 21, 22

*United States v. Corbitt,*
    879 F.2d 224 (7th Cir. 1989) . . . . . . . . . . . . 21, 22

*United States v. Dupes,*
    513 F.3d 338 (2d Cir. 2008) . . . . . . . . . . . . . 14, 16

*United States v. Eaglin,*
    913 F.3d 88 (2d Cir. 2019) . . . . . . . . . . . . . . . . . 13

*United States v. Esteras,*
    102 F.4th 98 (2d Cir. 2024) . . . . . . . . . . . . . . . . . 21

*United States v. Floyd,*
    840 F. App'x 625 (2d Cir. 2021) . . . . . . . . . . . . . 25

*United States v. Forney,*
    797 F. App'x 31 (2d Cir. 2020) . . . . . . . . . . . . . . 14

*United States v. Green,*
    618 F.3d 120 (2d Cir. 2010) . . . . . . . . . . . . . . . . 15

*United States v. Lee,*
    No. 15 Cr. 142 (RWS), 2016 WL 8674687
    (S.D.N.Y. May 27, 2016). . . . . . . . . . . . . . . . . . . 20

*United States v. Matta,*
    777 F.3d 116 (2d Cir. 2015) . . . . . . . 14, 15, 25, 26

*United States v. Miller,*
    No. 19 Cr. 245 (KMK), 2020 WL 1434401
    (S.D.N.Y. Mar. 24, 2020) . . . . . . . . . . . . . . . . . . 20

iv

PAGE

*United States v. Moore*,
    975 F.3d 84 (2d Cir. 2020) . . . . . . . . . . . . . . . . . 15

*United States v. Napout*,
    963 F.3d 163 (2d Cir. 2020) . . . . . . . . . . . . . . . . 20

*United States v. Oliveras*,
    96 F.4th 298 (2d Cir. 2024) . . . . . . . . . . . . . . . . 23

*United States v. Rosado*,
    109 F.4th 120 (2d Cir. 2024) . . . . . . . . . . . . . . . 17

*United States v. Rosario*,
    386 F.3d 166 (2d Cir. 2004) . . . . . . . . . . . . . . . . 17

*United States v. Schlette*,
    842 F.2d 1574 (9th Cir. 1988) . . . . . . . . . . . . . . 22

*United States v. Sims*,
    92 F.4th 115 (2d Cir. 2024) . . . . . . . . . . . . . 12, 13

*United States v. Villafane-Lozada*,
    973 F.3d 147 (2d Cir. 2020) . . . . . . . . . . . . . . . . 26

*United States v. Villafuerte*,
    502 F.3d 204 (2d Cir. 2007) . . . . . . . . . . . . . . . . 15

*United States v. Washington*,
    904 F.3d 204 (2d Cir. 2018) . . . . . . . . . . . . . . . . 19

*United States v. Washington*,
    No. 22-688, 2024 WL 2232464
    (2d Cir. May 17, 2024) . . . . . . . . . . . . . . . . . . . . 13

*United States v. Young*,
    910 F.3d 665 (2d Cir. 2018) . . . . . . . . . . . . . . . . 26

v

PAGE

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

18 U.S.C. § 3583(d) . . . . . . . . . . . . . . . . . . . . . . . 12, 13

29 U.S.C. § 1182 . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Fed. R. Crim. P. 52(b) . . . . . . . . . . . . . . . . . . . . . . 15

U.S.S.G. § 5D1.3 . . . . . . . . . . . . . . . . . . . . . 12, 13, 17

# United States Court of Appeals

## FOR THE SECOND CIRCUIT
## Docket No. 24-1099

―――――――

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

AIMEE HARRIS,

*Defendant-Appellant,*

ROBERT KURLANDER,

*Defendant.*

―――――――

## BRIEF FOR THE UNITED STATES OF AMERICA

―――――――

### Preliminary Statement

Aimee Harris appeals from a judgment of conviction entered on April 18, 2024, in the United States District Court for the Southern District of New York, by the Honorable Laura Taylor Swain, Chief United States District Judge, following Harris's guilty plea.

Information 22 Cr. 457 (LTS) was filed on August 25, 2022, charging Harris with one count of conspiracy to commit interstate transportation of stolen property, in violation of 18 U.S.C. § 371. That same day, Harris

2

pled guilty to the sole count of the Information, pursuant to a written plea agreement.

On April 9, 2024, Chief Judge Swain sentenced Harris to one month of imprisonment, to be followed by three years of supervised release including three months' home detention, and imposed forfeiture of $20,000 and a $100 mandatory special assessment.

Harris has completed her sentence of imprisonment and is now serving her term of supervised release.

## Statement of Facts

### A. The Offense Conduct

In 2020, Harris stole, transported across state lines, and agreed to sell the personal property of an individual (the "Victim"), including the Victim's personal journal. At the time Harris committed the crime, she knew the Victim was an immediate family member of a then-former government official who was a candidate for national public office ("Candidate-1"). (2024 PSR ¶¶ 9, 11).[1]

--------

[1] "2022 PSR," "2022 Presentence Report," "2024 PSR," and "2024 Presentence Report" refer to the Presentence Investigation Reports dated November 18, 2022, and April 5, 2024, respectively, prepared by the United States Probation Office ("Probation Office") in connection with Harris's sentencing; "Br." refers to Harris's brief on appeal; and "A." refers to the appendix filed with that brief. Unless otherwise noted,

3

In the summer of 2020, Harris was temporarily residing in a friend's private residence in Florida (the "Residence"), in the same room in which the Victim had recently previously resided. (2024 PSR ¶¶ 11-12). In the Residence, Harris found some of the Victim's personal belongings that the owner of the Residence had permitted the Victim to store there, including a handwritten journal containing highly personal entries (the "Journal"), tax records, a digital camera, a digital storage card containing private family photographs, a cellphone, books, clothing, and luggage. (2024 PSR ¶¶ 9, 11-12). Harris knew at the time that the Victim was a member of the immediate family of Candidate-1. (2024 PSR ¶¶ 9, 12).

Harris thereafter stole the Victim's personal property and enlisted co-defendant Robert Kurlander to facilitate its sale. (2024 PSR ¶¶ 9, 13). Kurlander told Harris that the two could "make a SHIT TON of money" from selling the Victim's property given its sensitivity and highly personal nature. (2024 PSR ¶ 13).

In September 2020, Harris and Kurlander attended a political fundraiser in Florida to benefit the campaign of an individual ("Candidate-2") who was running for office against Candidate-1, hoping to sell the stolen property to the campaign. (2024 PSR ¶ 14). Kurlander texted Harris to remind her to bring the stolen property to the event, writing "On Sunday you

—————

quotations omit all internal quotation marks, footnotes, citations, and previous alterations.

4

may have a chance to make so much money." (2024 PSR ¶ 15). Harris, who had stolen additional items belonging to the Victim, responded, "Omg. Coming with stuff that neither one of us have seen or spoken about," adding "I can't wait to show you what Mama has to bring to Papa." (*Id.*).

A representative of Candidate-2's campaign later conveyed to Harris and Kurlander that the campaign was not interested in purchasing the Victim's property and advised Harris and Kurlander to provide the items to the Federal Bureau of Investigation. (2024 PSR ¶ 16). Kurlander then informed Harris that he was in touch with a New York-based political activist organization (the "Organization") that was potentially interested in purchasing the stolen property. (2024 PSR ¶ 17). Kurlander told Harris that he was going to "find a way for you to make some money from this." (*Id.*). An employee of the Organization instructed Harris and Kurlander to use an encrypted application to communicate with the Organization going forward. (2024 PSR ¶ 18).

On September 12, 2020, Harris and Kurlander traveled at the Organization's expense from Florida to New York with some of the stolen property and met with representatives of the Organization. (2024 PSR ¶¶ 19-20). The Organization's representatives agreed to make an initial payment of $10,000 for the property and instructed Harris and Kurlander to provide additional property of the Victim, in part to authenticate the Journal, promising that the value of the items already provided to the Organization would increase if they did so. (2024 PSR ¶ 21).

5

Harris and Kurlander returned to Florida and continued negotiating with the Organization for more money in exchange for stealing additional property from the Victim. (2024 PSR ¶¶ 22-25). Shortly thereafter, the two stole more items from the Residence, including, among other things, the Victim's tax documents, clothing, and luggage. (2024 PSR ¶ 26). An employee of the Organization traveled to Florida, where Harris and Kurlander turned over the additional stolen property, understanding that the property would be transported to New York. (2024 PSR ¶¶ 27-28).

Ultimately, the Organization paid Harris and Kurlander a total of $40,000 for the Victim's stolen property, with Harris and Kurlander each receiving $20,000. (2024 PSR ¶ 29).

## B.  Harris's Guilty Plea

On August 25, 2022, Harris pled guilty to the sole count of the Information pursuant to a written plea agreement. (A. 33-70). In the plea agreement, the parties stipulated that the applicable range under the United States Sentencing Guidelines was 8 to 14 months' imprisonment and that Harris would forfeit $20,000. (A. 33-34).

## C.  The Presentence Reports

In the fall of 2022, the Probation Office prepared the 2022 Presentence Report in advance of Harris's sentencing. Consistent with the parties' plea agreement, the Probation Office determined that the applicable Guidelines range was 8 to 14 months' imprisonment. (2022 PSR ¶¶ 4, 35-48, 100). The report also

6

included a detailed history of several problematic personal relationships, Harris's struggles with her mental and emotional health, and her substance abuse history over several decades. (2022 PSR ¶¶ 53-70, 74-84). The report noted, among other things, that Harris had first engaged with mental health therapy when "she was in middle school" and that she suffered from anxiety, post-traumatic stress disorders, battered woman syndrome, and situational depression. (2022 PSR ¶¶ 74-75, 77). It also noted that Harris had "expressed interests in continuing mental health counseling in the future." (2022 PSR ¶ 78).

The Probation Office recommended several special conditions of supervised release and explained why those conditions were appropriate. "Given Harris' mental health and substance abuse history," the Probation Office concluded that "special conditions requiring her to comply with mental health and substance use treatment/testing as deemed appropriate by the U.S. Probation Office are warranted." (2022 PSR at 24). The Probation Office recommended special conditions of supervision requiring participation in outpatient mental health and drug treatment programs, the proposed language for which took the standard form of such conditions in the Southern District of New York, including language authorizing the Probation Office to release "available psychological and psychiatric evaluations and reports, including the presentence investigation report," and "available drug treatment evaluations and reports, including the presentence investigation report," to the respective treatment providers. (2022 PSR at 27).

7

On April 5, 2024, after Harris's sentencing had been delayed several times, the Probation Office issued the 2024 Presentence Report, noting that after the issuance of the original report in 2022, Harris "had some non-compliance issues." (2024 PSR ¶ 7). In January 2023, Harris was cited by law enforcement officers for running a red light, failing to register her vehicle, and having no proof of car insurance. (*Id.*). In July 2023, Harris was arrested and charged with, among other things, driving under the influence causing property damage, and she tested positive for marijuana. (*Id.*). Additionally, applying an intervening Guidelines amendment, the 2024 Presentence Report recalculated the applicable Guidelines range to be 4 to 10 months' imprisonment. (2024 PSR ¶ 104). The 2024 Presentence Report included the same recommended special conditions of supervised release and the same reasons for them as had the original report. (2024 PSR at 33, 35).

### D.  Harris's Sentencing

In her written sentencing submissions, Harris sought a non-custodial sentence based, in large part, on her longstanding struggles with her mental health. (A. 83-85, 87). She emphasized that she had first been "engaged in mental health counseling when  she was in middle school," and that she had been diagnosed with "depression," "post-traumatic stress disorder," and "battered woman syndrome," among other things. (A. 84-85; *see* A. 119-20). She also touted "her recognition of the benefits of active engagement in mental health counseling" (A. 84) and explained that she was

8

engaged in ongoing mental health treatment. (*See* A. 119).

The Government sought a sentence within the applicable Guidelines range of 4 to 10 months' imprisonment, citing the nature and seriousness of Harris's conduct; Harris's pattern of disrespecting the law and the justice system, both before and after her guilty plea; and the other 18 U.S.C. § 3553(a) factors. (A. 118; *see* 153-61).

Harris appeared for sentencing on April 9, 2024. (A. 135-84). At the outset of the proceeding, Harris confirmed that she had personally reviewed the "entire" 2024 Presentence Report and discussed it with her attorney. (A. 143). Harris had no objections to the report. (A. 143). Defense counsel again advocated for a non-incarceratory sentence, emphasizing, among other things, Harris's "great deal of pain and trauma," that she was a "survivor of abuse and violence," and that she was "struggling with . . . life stressors." (A. 146-47, 151; *see* A. 152 (referencing "extensive trauma history")). Counsel noted that Harris had "participated for the duration of her supervision in mental health treatment and is committed to doing so as part of continued supervision." (A. 147-48).

Harris also personally addressed the Court, stating that she was "struggling with health issues" and had "a long-term history and long timeline of trauma and domestic abuse resulting in crippling anxiety, PTSD, CPTSD, [and] battered women syndrome." (A. 161). She also stated that her "daily struggles and obstacles are not easy, triggering, messy, [and] heartbreaking,"

9

and that she lives in "a constant state of fight or flight." (A. 161-62).

The District Court then explained its analysis of the Section 3553(a) factors and the reasons for the sentence to be imposed. (A. 163-71). The District Court observed that Harris's conduct was "serious," "deliberate," "despicable," and "was done with the full knowledge of the havoc that [making] public information contained within the property could wreak in the life of the victim." (A. 164-65). Harris "was motivated by greed," "knew that she was betraying the trust of the victim," and her "actions, as she was surely capable of foreseeing, resulted in real and enduring harm." (A. 165). The District Court also noted that, during the pendency of this case, Harris's "conduct has been disrespectful of the law, wasteful of the resources of the Court and the government, and disdainful of the defense counsel who have worked hard to assist her." (A. 169). The District Court also highlighted several mitigating factors, including Harris's "mental health struggles" and that Harris "has been engaged regularly since 2015 in mental health counseling for treatment of PTSD and other issues arising from her history of abuse." (A. 167, 171).

The District Court then announced that it intended to sentence Harris to one month of imprisonment, to be followed by three years of supervised release, including three months of home detention. (A. 172). The District Court explained that it had "chosen to impose less than the recommended prison time in order to enable Ms. Harris . . . to continue in community-based therapy." (A. 172). The District Court also described

10

the special conditions of supervised release that it intended to impose, tracking in all material respects the language recommended in the Presentence Reports but adding the phrase "as directed by the probation officer" to the end of each sentence authorizing disclosure of relevant records to the treatment provider and omitting express mention of the presentence report from the mental health treatment condition. (A. 172-74).

After the District Court described the sentence it intended to impose, it gave both sides the opportunity to raise any legal objections to the proposed sentence. (A. 174-75). Both parties confirmed that they had no such objections, and the District Court imposed the sentence as described. (A. 174-75). The written judgment, entered on April 18, 2024, included the substance abuse and mental health treatment conditions in the following form, in relevant part:

> Defendant must participate in an outpatient substance abuse treatment program ... The Court authorizes the release of available drug treatment evaluations and reports, including the presentence investigation report, to the substance abuse treatment provider, as directed by the Probation Officer.

> Defendant must participate in an outpatient mental health program ... The Court authorizes the release of available psychological and psychiatric evaluations and reports, including the presentence

11

> investigation report, to the health care
> provider.

(A. 189).

## **A R G U M E N T**

### **The District Court Did Not Plainly Err in Authorizing the Release of Relevant Information to Treatment Providers**

For the first time on appeal, Harris argues that the District Court plainly erred in including in its pronouncement of special conditions of supervised release authorization for the Probation Office to share relevant records with Harris's treatment providers. (Br. 20-34).[2] Harris's argument is meritless. The challenged language, to which Harris did not object in the District Court, is a routine and necessary component of administering treatment and is regularly included in mental health and substance abuse treatment conditions imposed in the Southern District of New York. There was no error, plain or otherwise, in the District Court's exercise of its discretion to ensure that the treatment Harris will receive is maximally effective by equipping the treatment providers with necessary background information.

––––––––––

[2]  Harris does not challenge inclusion of the substance abuse treatment or mental health treatment conditions themselves, only the accompanying records-sharing authorization.

12

## A. Applicable Law

### 1. Conditions of Supervised Release

A district court has "broad discretion" to impose any conditions of supervised release that it deems appropriate. *United States v. Betts*, 886 F.3d 198, 202 (2d Cir. 2018). The Guidelines set forth "[m]andatory" and "[d]iscretionary" conditions of supervised release, and the latter category includes both "standard conditions" and "special conditions." U.S.S.G. § 5D1.3. Discretionary conditions of supervised release must be "reasonably related" to the relevant statutory sentencing factors:

> (A) the nature and circumstances of the offense and the history and characteristics of the defendant; (B) the need for the sentence imposed to afford adequate deterrence to criminal conduct; (C) the need to protect the public from further crimes of the defendant; and (D) the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

U.S.S.G. § 5D1.3(b)(1); *see also* 18 U.S.C. § 3583(d). "Despite the use of the conjunctive in the Guidelines, a condition may be imposed if it is reasonably related to any one or more of the specified factors." *United States v. Brown*, 402 F.3d 133, 137 (2d Cir. 2005); *accord United States v. Sims*, 92 F.4th 115, 124 (2d Cir. 2024). Conditions of supervised release must also involve no greater deprivation of liberty than is

13

"reasonably necessary" to serve the relevant purposes of sentencing and be consistent with any pertinent Sentencing Commission policy statements. *Betts*, 886 F.3d at 202; U.S.S.G. § 5D1.3(b)(2); 18 U.S.C. § 3583(d). "[T]rial courts traditionally have enjoyed broad discretion to tailor the conditions of probation [and supervised release] to the particular circumstances of each case, provided that such conditions are reasonably related to the dual goals of rehabilitating the offender and protecting the public." *United States v. A-Abras Inc.*, 185 F.3d 26, 30 (2d Cir. 1999); *see also United States v. Chaklader*, 232 F.3d 343, 348 (2d Cir. 2000) (stressing that district courts, in fashioning conditions of supervised release, have "wide discretion to protect the public from further crimes and to rehabilitate the defendant").

The "appropriateness" of a special condition "is contingent on whether certain circumstances are present." *Sims*, 92 F.4th at 119 n.1. "A district court is required to make an individualized assessment when determining whether to impose a special condition of supervised release, and to state on the record the reason for imposing it." *Betts*, 886 F.3d at 202. The justification for imposing a special condition "must be adequately supported by the record." *United States v. Eaglin*, 913 F.3d 88, 94 (2d Cir. 2019). Even absent an express explanation for a special condition, there is no error if "the district court's reasoning is self-evident in the record." *Betts*, 886 F.3d at 202; *see also United States v. Washington*, No. 22-688, 2024 WL 2232464, at *3 (2d Cir. May 17, 2024) (summary order) (rationale for financial information and credit conditions was "readily apparent from the record" where

14

defendant was required to pay restitution in monthly installments); *United States v. Ahmed*, 802 F. App'x 614, 619 (2d Cir. 2020) (rationale for condition that defendant cooperate with Probation Office in seeking and entering into self-employment was "abundantly evident from the record" where defendant fabricated fraudulent bills while self-employed); *United States v. Forney*, 797 F. App'x 31, 33 (2d Cir. 2020) (rationale for condition that defendant abstain from alcohol self-evident where defendant pleaded guilty to driving while impaired by alcohol while on pretrial release).

Although a district court may not delegate to the Probation Office "decisionmaking authority which would make a defendant's liberty itself contingent on a probation officer's exercise of discretion"—such as the choice between imposing inpatient or outpatient drug treatment—details regarding how to administer a condition, such as "the selection of a therapy provider or treatment schedule," may be left to the Probation Office. *United States v. Matta*, 777 F.3d 116, 122 (2d Cir. 2015). "In other words, the Probation Office may supervise and execute a sentence but may not fashion a sentence's terms." *United States v. Carlineo*, 998 F.3d 533, 538 (2d Cir. 2021).

## 2. Standard of Review

This Court reviews preserved objections to special conditions of supervised release for abuse of discretion. *See United States v. Dupes*, 513 F.3d 338, 342-43 (2d Cir. 2008). But where a defendant failed to object to a condition despite having an opportunity to do so, this Court reviews only for plain error. *See id.* at 343 & n.2;

15

Fed. R. Crim. P. 52(b). To establish plain error, a defendant bears the burden of demonstrating that: "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Moore*, 975 F.3d 84, 90 (2d Cir. 2020). "[R]eversal for plain error should be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007). "Meeting all four prongs [of the plain error standard] is difficult, as it should be." *Puckett v. United States*, 556 U.S. 129, 135 (2009).

## B. Discussion

### 1. Ordinary Plain Error Review Applies

Harris asks this Court to apply a "relaxed" form of plain error review. (Br. 21-22). This Court should reject that invitation.

In "rare cases," this Court has applied a "relaxed" plain error standard where a defendant had no chance to contemporaneously object because she "lacked sufficient prior notice that a particular condition of supervision might be imposed." *Matta*, 777 F.3d at 121-22; *accord United States v. Green*, 618 F.3d 120, 122 (2d Cir. 2010) (applying relaxed standard where "the full terms of the [supervised release] condition were still unknown at the oral [sentencing] hearing because the condition was not imposed until the judge issued the final written order," so defendant was "completely deprived of any opportunity to object"). By contrast, this

16

Court has applied ordinary plain error review where a defendant received advance notice that a particular condition of supervision might be imposed and failed to object. *See United States v. Bleau*, 930 F.3d 35, 39 (2d Cir. 2019) ("[W]e review for plain error where, as here, the defendant had advance notice of the challenged condition and failed to object during sentencing."); *Dupes*, 513 F.3d at 343 n.2 (declining to apply relaxed standard where presentence report provided defendant with notice that challenged condition of supervised release might be imposed).

Here, Harris received substantial advance notice that her supervised release conditions might include the challenged disclosure language. (*See* 2022 PSR at 27; 2024 PSR at 35; A. 173-74). Harris never objected to that language at any point. Indeed, after the District Court announced its intention to authorize such disclosure, Harris was again given an opportunity to object and confirmed that she had no legal objections to the proposed sentence. (A. 174-75). The presence of the challenged language in the Presentence Reports and Harris's opportunity to object after hearing the District Court's intended sentence are each independently sufficient to justify strict application of the ordinary plain error standard. *See, e.g.*, *United States v. Adams*, 749 F. App'x 25, 27 n.1 (2d Cir. 2018) (applying ordinary plain error review where defendant failed to object despite being asked "whether [he] wanted to 'add anything'" after imposition of the supervised-release conditions).

Harris's argument that the conditions were "not sufficiently previewed" because of minor differences

17

between the wording suggested in the Presentence Reports, described orally at sentence, and memorialized in the written judgment, is meritless. (Br. 21). The Presentence Reports gave Harris advance notice that the District Court might authorize the release of prior treatment records to future treatment providers, (2022 PSR at 27; 2024 PSR at 35), and the inconsequential variations in wording at various points did not somehow undo that advance notice. The substance of the challenged authorizations were known to Harris long before sentencing, and any deviation in wording is immaterial to the notice inquiry.[3]

––––––––––

[3] This is not a case where minor variation in wording between oral pronouncement and written judgment has any material impact. *See United States v. Rosario*, 386 F.3d 166, 169 (2d Cir. 2004) (no error where written judgment adds conditions recommended in U.S.S.G. § 5D1.3(d) like mental health or substance abuse treatment, or "basic administrative requirements that are necessary to supervised release," that were not included in oral pronouncement). The challenged disclosure language at issue in this case does not "impose new burdensome punishments or restrictions" that must be removed from the written judgment. *United States v. Rosado*, 109 F.4th 120, 124-25 (2d Cir. 2024).

18

### 2. There Was No Error, Plain or Otherwise, in the District Court's Standard Disclosure Authorizations in Aid of Effective Supervision

The District Court did not err, much less plainly err, in authorizing the Probation Office to disclose prior evaluations and treatment records to Harris's future mental health and substance abuse treatment providers, as typically occurs in the Southern District of New York when special conditions requiring such treatment are imposed.

Even assuming this ancillary disclosure order is to be assessed as if it was itself a special condition, it is "self-evident" from the record, *Betts*, 886 F.3d at 202, that the District Court reasonably concluded that authorizing the Probation Office to equip Harris's treatment providers with whatever substance abuse and mental health evaluations and reports the Probation Office possessed—including the operative presentence report—would meaningfully assist those providers in rendering effective treatment, and therefore in fulfilling the rehabilitation and public safety-related objectives of these special conditions. The reasons for such disclosure are obvious: it would make little sense to require a supervisee to attend drug treatment at the direction of the Probation Office but to simultaneously forbid the Probation Office from sharing with the treatment provider what it knew about the supervisee's past drug use. Similarly, a mental health treatment requirement would be of little practical use in rehabilitating a criminal defendant if the therapist was prohibited from learning about her patient, including

19

details about the patient's criminal conduct and personal history contained in the presentence report.

Indeed, sentencing courts routinely authorize the release of mental health and substance abuse treatment records and evaluations to treatment providers when imposing special conditions of supervised release requiring participation in such treatment—notwithstanding Harris's implication to the contrary (Br. 30-31). *See, e.g.*, *United States v. Washington*, 904 F.3d 204, 206 (2d Cir. 2018) (remanding to district court only for removal of polygraph aspect of condition that also included: "The Court authorizes the release of available psychological and psychiatric evaluations and reports, including the presentence investigation report, to the sex offender treatment provider and/or mental health treatment provider."); *United States v. Esposito*, No. 21 Cr. 313 (JPO), Dkt. 212 at 4 (S.D.N.Y. June 9, 2023) (judgment included drug and alcohol treatment condition, including: "The court authorizes the release of available drug treatment evaluations and reports, including the presentence report, to the substance abuse treatment provider."; and mental health treatment condition, including: "The court authorizes the release of available psychological and psychiatric evaluations and reports, including the presentence report, to the health care provider."); *United States v. Badolato*, No. 20 Cr. 412 (AT), Dkt. 388 at 5 (S.D.N.Y. Apr. 27. 2023) (similar); *United States v. Figueroa*, No. 22 Cr. 605 (DLC), Dkt. 25 at 5 (S.D.N.Y. Feb. 10, 2023) (similar); *United States v. Shah*, No. 19 Cr. 833 (SHS), Dkt. 670 at 5 (S.D.N.Y. Jan. 12, 2023) (similar); *United States v. Elkorany*, No. 20 Cr. 437 (NRB), Dkt. 74 at 5 (S.D.N.Y. Nov. 8, 2022) (similar);

20

*United States v. Hall*, No. 21 Cr. 605 (GHW), Dkt. 66 at 5 (S.D.N.Y. Dec. 21, 2022) (similar); *United States v. Avenatti*, No. 19 Cr. 373 (PGG), Dkt. 339 at 6 (S.D.N.Y. July 15, 2021) (similar). Courts also frequently expressly vest supervision of such disclosures with the Probation Office, though such supervision is plainly implied even in the absence of such express language. *See, e.g.*, *United States v. Miller*, No. 19 Cr. 245 (KMK), 2020 WL 1434401, at *3 (S.D.N.Y. Mar. 24, 2020) (judgment included drug and alcohol treatment condition, including: "The Court authorizes the release of available drug treatment evaluations and reports to the substance abuse treatment provider, as approved by the Probation Officer."); *United States v. Lee*, No. 15 Cr. 142 (RWS), 2016 WL 8674687, at *4 (S.D.N.Y. May 27, 2016) (sentence imposed included drug and alcohol treatment condition, including: "The Court authorizes the release of available drug treatment evaluations and reports, including presentence investigation report, to the substance abuse treatment provider, as approved by the Probation Officer.").

Harris's failure to identify any case holding that such a commonplace disclosure order constitutes an abuse of discretion is fatal to her claim on plain-error review. *See United States v. Napout*, 963 F.3d 163, 183 (2d Cir. 2020) ("[F]or an error to be plain, it must, at a minimum, be clear under current law, which means that we typically will not find such error . . . where there is no binding precedent from the Supreme Court or this Court."). As in any case in which treatment conditions are imposed, the District Court's decision to follow such standard practices that are so clearly well justified by the circumstances was not an abuse of

21

discretion, let alone an error "so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to object." *United States v. Esteras*, 102 F.4th 98, 108 (2d Cir. 2024).

Moreover, Harris's particular conduct in this case underscores the reasonableness of the District Court's decision to authorize disclosure of evaluation and treatment records to the treatment providers. The record was replete with examples of Harris's deceptive conduct, including to the District Court, which cast doubt on whether Harris could be trusted to accurately report the facts and circumstances of her criminal case and other aspects of her life to her treatment providers. For example, in April 2021, a state court issued an order in which it "admonished Harris for testimony that was deemed not credible." (2024 PSR ¶ 68). And at sentencing, the District Court found it "particularly galling" that Harris "made promises to the Court in connection with scheduling multiple court appearances that she had no intention of keeping." (A. 169). Given these instances of dishonesty, ensuring that Harris's treatment providers will be given unvarnished access to the factual record regarding Harris's personal history and characteristics, as well as her criminal conduct, was particularly well justified.

Harris's reliance on *United States v. Corbitt*, 879 F.2d 224 (7th Cir. 1989), and *United States v. Charmer Industries, Inc.*, 711 F.2d 1164 (2d Cir. 1983), (Br. 25-27), is misplaced. In those cases, this Court and the Seventh Circuit addressed the standard for unsealing a presentence report for disclosure to an *unrelated*

22

*third party*—a local newspaper in the former case and a state attorney general in connection with a liquor license investigation in the latter. *See Corbitt*, 879 F.2d at 226-27; *Charmer*, 711 F.2d at 1167-68. This Court in *Charmer* concluded that a "compelling" demonstration that disclosure was "required to meet the ends of justice" was necessary before disclosing a presentence report to a third party. *Id.* at 1175. But neither *Charmer* nor *Corbitt* addressed situations like this one, in which the disclosure is to an entity acting at the direction of the District Court—through its arm, the Probation Office—in executing a duly imposed sentence. There is no reason to believe that the treatment providers at issue here are not bound by the same requirements as is the Probation Office to preserve the confidentiality of any medical or treatment records and presentence reports. But even if the "compelling need" standard were applied here, the record reflects that such a need clearly exists to ensure the treatment providers understood the context for the court-ordered treatment to focus on those areas that would be most effective in providing rehabilitation and protecting the community. Given the meaningful need for disclosure here and the relatively minimal resulting intrusion on confidentiality, *see United States v. Schlette*, 842 F.2d 1574, 1581 (9th Cir. 1988) (disclosure assessment requires "balanc[ing] the need for disclosure against the reasons for confidentiality"), *amended*, 854 F.2d 359 (9th Cir. 1988), the District Court's decision was a reasonable exercise of its broad discretion—and certainly was not plainly erroneous.

Harris suggests that the authorized disclosures somehow are in tension with the physician-patient

23

privilege. (Br. 28-29). This argument is unpersuasive. The District Court's authorized disclosures would merely provide evaluation and treatment information to her *other* treatment providers who also share the same confidentiality obligations. There is no potential breach of confidentiality because any such sharing of relevant information does not expand access to Harris's substance abuse or mental health treatment information beyond those who are engaged in her treatment. In any event, Harris's premise that her sentence cannot justify any limitation on her "autonomy" to decide her own healthcare relationships (Br. 31) is wrong; some curtailment of medical autonomy is inherent in the imposition of court-ordered evaluations and treatment requirements, and in any event, those under court supervision in connection with criminal convictions have reduced expectations of privacy subject to the special needs of supervision, *see, e.g.*, *United States v. Oliveras*, 96 F.4th 298, 309-10 (2d Cir. 2024), and the challenged disclosure orders here plainly advance those special needs for the reasons described above. Treatment information is routinely shared by treatment providers working on behalf of the Probation Office or Pretrial Services Office with the supervising officer, and the challenged orders here are no different in kind or degree.[4]

_____

[4]  Harris's argument that "interjection" of her presentence report into her relationship with her long-time therapist will somehow damage her relationship with that therapist is difficult to understand. (Br. 30-31). That person may or may not be the mental health

24

Harris's references to the Due Process Clause of the United States Constitution, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 29 U.S.C. § 1182, and the common law, (Br. 28), are similarly unpersuasive. Apart from demonstrating the generic principle that presentence reports are sensitive documents—which the Government does not contest—Harris has not articulated the relevance of those legal provisions to the particular circumstances of this case. Similarly, Harris's argument that, in general, presentence reports may contain inaccuracies (Br. 25-26) is beside the point. At Harris's sentencing, Harris affirmed that she personally "reviewed the entire presentence report," and her counsel confirmed that Harris had "no objections or other issues with respect to the content of the report." (A. 143). The District

_____

treatment provider or substance abuse treatment provider selected by the Probation Office to fulfill the special conditions, and in any event preventing the therapist from learning the details of Harris's criminal case would plainly damage the effectiveness of the treatment-related special conditions. Contrary to Harris's description, the 2024 Presentence Report does not contain "the government's position" about Harris's conduct that might somehow be unfairly or inaccurately skewed (Br. 31); it contains the definitive factual record of Harris's conduct as found by the District Court at sentencing without objection or requests for modification from Harris. (A. 143, 163). Harris cannot now disclaim the report's accuracy.

25

Court therefore adopted the facts set forth in the 2024 Presentence Report without objection. (A. 163). On appeal, Harris does not identify even a single purported inaccuracy—nor would this Court hear such a complaint given her acknowledgement of accuracy below. There is no basis to question the District Court's routine exercise of discretion here.

### 3. The District Court's Disclosure Authorization Did Not Improperly Delegate Sentencing Authority to the Probation Office

Harris also argues that the District Court improperly delegated its authority to the Probation Office by authorizing the supervising Probation Officer to make decisions about what prior treatment records and evaluations are shared with the treatment providers. (Br. 32-33). Harris's argument is meritless.

The District Court in no way deferred to the Probation Office to "fashion [the] sentence's terms," *Carlineo*, 998 F.3d at 538, by making Harris's "liberty itself contingent on a probation officer's exercise of discretion," *Matta*, 777 F.3d at 122. Rather, supervising the disclosure of information to treatment providers is precisely the type of responsibility to "supervise and execute a sentence" for which the Probation Office exists in the first place. *Carlineo*, 998 F.3d at 538; *cf. United States v. Floyd*, 840 F. App'x 625, 627-28 (2d Cir. 2021) (affirming curfew condition that permitted Probation Office to adjust curfew times because "the District Court did not delegate to the Probation Office decision-making authority that makes [defendant's]

26

liberty contingent on his probation officer's exercise of discretion—the Probation Office cannot decide whether to impose the curfew in the first instance; it can only adjust the curfew times to accommodate [defendant]").

Harris's characterization of the Probation Office's routine role in administering the treatment conditions as a "decision whether to invade the medical professional-client relationship" (Br. 34) is inaccurate. The mere provision of evaluations and reports by other medical and treatment professionals, or the 2024 Presentence Report, to Harris's current treatment providers plainly does not constitute some type of "inva[sion]" and has no bearing on Harris's liberty. And it is far less significant than other delegations to the Probation Office that this Court has found appropriate. *See, e.g.*, *United States v. Villafane-Lozada*, 973 F.3d 147, 152-53 (2d Cir. 2020) (affirming verification testing condition that left selection of verification technology to Probation Office); *United States v. Young*, 910 F.3d 665, 671-72 (2d Cir. 2018) (affirming mental health treatment condition that left implementation details to Probation Office). Indeed, if "the selection of a therapy provider or treatment schedule" may be left to the Probation Office, *Matta*, 777 F.3d at 122, then the mere provision of information to that treatment provider cannot be an impermissible "invasion" of a relationship with a provider whom the Probation Office permissibly has authority to select and change.

27

## CONCLUSION

### The judgment of conviction should be affirmed.

Dated:   New York, New York
         December 26, 2024

Respectfully submitted,

EDWARD Y. KIM,
*Acting United States Attorney for the*
*Southern District of New York,*
*Attorney for the United States*
    *of America.*

JACQUELINE C. KELLY,
ROBERT B. SOBELMAN,
MITZI S. STEINER,
JACOB R. FIDDELMAN,
    *Assistant United States Attorneys,*
        *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 5,982 words in this brief.

EDWARD Y. KIM,
*Acting United States Attorney for the*
*Southern District of New York*

By: JACOB R. FIDDELMAN
*Assistant United States Attorney*